

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

v.                             Criminal Action No.1:96CR43-01

FLOYD RAYMOND LOOKER,

      Defendant.

**APPLICATION FOR WRIT OF HABEAS CORPUS
AND MOTION TO DISMISS INDICTMENT WITH
<u>MEMORANDUM OF LAW IN SUPPORT</u>**

The defendant, Floyd Raymond Looker, Jr., respectfully moves that the indictment in this case be dismissed for violation of the Due Process clause of the Fifth Amendment to the United States Constitution, as set forth in the following separate and collective reasons and grounds:

    1.     Outrageous Government conduct through an illegal investigation and extensive involvement and control of the alleged criminal activity.

    2.     The Government has denied the defendant due process in preparation for trial through psychological destabilization and restricted access to the Court, i.e. cruel and unusual punishment, and violation of constitutional and civil rights.

    3.     The Government has improperly utilized the Grand Jury process to seek discovery in this and related cases.

1



4.     The Government has specifically targeted this defendant and certain co-defendants solely because of membership in patriot groups.

## MEMORANDUM IN SUPPORT

1)     OUTRAGEOUS GOVERNMENT MISCONDUCT THROUGH
        AN ILLEGAL INVESTIGATION AND EXTENSIVE
        INVOLVEMENT AND CONTROL OF THE ALLEGED CRIME.

The defense of outrageous Government misconduct has its origins in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed. 2d 366 (1973), where the Supreme Court stated that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that the process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction." *Id.* at 432-32, 93 S.Ct. at 1643.

Because of the "difficulties attending the notion that due process of law can be embodied in fixed rules," *Id.* at 431, 93 S.Ct. at 1642, Courts recognizing the outrageous conduct defense have not attempted to attach a precise definition to its requirements. Rather, the relevant inquiry is whether, considering the totality of the circumstances in any given case, the Government's conduct is so shocking, outrageous and intolerable that it offends "the universal sense of justice." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643.

In *Sherman v. United States*, 356 U.S. at 377 N. 7, 78 S.Ct. at 823, the Court left the matter at: "The function of law enforcement is the prevention of crime and the apprehension of criminals." Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, "a different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of the innocent person the predisposition to

2

commit the alleged offense and induce its commission in order that they may prosecute." *Id.* at

372, 78 S.Ct. at 820, quoting *Sorrells v. United States*, 287 U.S. at 442, 53 S.Ct. at 212.

Mr. Justice Roberts in *Sorrells* put the idea in the following words:

> The applicable principle is that Courts must be closed to the trial of a crime instigated by the Government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy. 287 U.S. at 459, 53 S.Ct. at 219.

Several Federal Courts have adopted the objective test, or a variant thereof, focusing on

the conduct of the Government agents, rather than the "predisposition" of the particular

defendant. *United States v. Russell*, 93 S.Ct. at 1649, footnote 3 (citations omitted).

In *United States v. Lacey*, 86 F.3d 956, the Court made the distinction between a defense

of outrageous Government misconduct and the defense of entrapment, in that the entrapment

defense looks at the state of mind of the defendant to determine whether he or she was

predisposed to commit the crime for which they are prosecuted, while the outrageous conduct

defense looks at the Government's behavior. The court in *Lacey* also pointed that "most" of the

federal circuits have recognized the viability of the defense. *Id.,* at 964, fn. 6.

In *United States v. Santana,* 6 F.3d 1 (1st Cir. 1993), the court stated that "outrageousness,

by its nature, requires an *ad hoc* determination." *Id.,* at 6. The court also pointed out that the

government's actions "can only be evaluated by taking into account the totality of the relevant

circumstances." *Id.,* at 7.

The defendant is charged with violating the provisions of 18 U.S.C. §2339A, providing

material support to terrorists.

In this case the Government had no evidence whatsoever to believe that defendant or any

3

member of the Mountaineer Militia was involved in *any* form of criminal activity prior to the activities of the paid informant Okey Marshall Richards.  In fact, FBI agent J.C. Raffety testified to such fact.  The evidence will likely show that the delay in taping meetings and telephone calls was to allow informant Richards the necessary time to lay a foundation for creating criminal activity.  Defense also contends that the FBI continuing the investigation past time of incarceration was not called for, but was used as a means of terrorizing defendant's wife and to psychologically destabilize months of incarceration.

In *United States v. Lard,* 734 F.2d 1290 (8th Cir. 1984), the court, in reversing the defendants' conviction for conspiring to transfer and transferring a pipe bomb stated that the federal agent's "overinvolvement in conceiving and contriving the crimes...approached" the outrageousness standard set forth in *Russell.  Id.,* at 1296.  Much like the case at bar, in *Lard,* the court found that the federal agent's activity was excessive.  The court stated at 1297:

> Anderson's [the agent] conduct was not aimed at facilitating discovery or suppression of ongoing illicit dealings in unregistered firearms.  Rather, it was aimed at creating new crimes for the sake of bringing criminal charges against Lard, who, before being induced, was lawfully and peacefully minding his own affairs.

In *United States v. Twigg,* 588 F.2d 373 (3rd Cir. 1978), the court reversed a conviction where federal agents had established a methamphetamine manufacturing laboratory, supplying the chemicals, manufacturing materials and location.

The question is whether the defendant is entitled to a pretrial evidentiary hearing to determine the issue.  It has been said that the "test for granting an evidentiary hearing in a criminal case should be substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?"  *United States v. Panitz,* 907 F.2d 1267, 1273 (1st Cir.

4

1990).  Defendant submits that an evidentiary hearing would show that absolutely no criminal activity was undertaken by the defendants until after the active involvement of Okey Richards in the Mountaineer Militia; after Richards endeared himself to the members of the militia; after Richards planted idea after idea into the minds of the militia members.  Mr. Richards provided transportation and finances for travel and expenses throughout West Virginia, Ohio and southwestern Pennsylvania.   Defendant's financial situation made him especially vulnerable to the FBI and informant Okey Marshall Richards, who prided himself on his marketing expertise and his ability to "sell crushed ice to the Eskimos."  All of these actions were under the control, advice and financial backing of the FBI through its paid informant, Okey Marshall Richards.

Accordingly, defendant requests an evidentiary hearing on this issue

2)    THE GOVERNMENT HAS DENIED DEFENDANT DUE PROCESS IN PREPARATION FOR TRIAL THROUGH PSYCHOLOGICAL DESTABILIZATION AND RESTRICTED ACCESS TO THE COURT.

a.    The Government denied defendant his Prozac medication for three months before a Court order forced them to comply.

b.    The Government further sought to destabilize defendant by moving him from jail facility to jail facility during the first month of incarceration.

c.    The Government continued to stalk defendant's wife on a continuous basis for several months, causing extreme psychological stress to defendant and his family.

d.    The Government fraudulently obtained a search warrant of defendant's house and smashed in his front door on November 1, 1996.

5

e.       Defendant was denied access to local Rules of Criminal Procedure for several months, even though he had repeatedly requested it from the Court and the Clerk of Courts. (October 11, 1996 - January 3, 1997)

f.       Defendant has ben denied all but limited access to the use of the NRJ-CF law library to 1 hour a week for the first five months of incarceration and five hours a week since March 10, 1997.

g.       Defendant has been denied the necessary research material to file motions and petitions to the Court.

h.       The defendant has been denied the use of a tape recorder to review audio tape recordings which are used as evidence against him.

i.       Defendant is only allowed limited use of one typewriter, which is also shared with 400 other inmates.

j.       Defendant is only allowed 75 copies on the Xerox copy machine each week, in spite of the fact that he has to prepare for four trials.

k.       Defendant is restricted to use of a paid collect call telephone which must also be shared with 16 - 23 other inmates.  Confidentiality is non-existent in such a situation!  Plus defendant has a hearing loss which makes it difficult to hear on the telephone.  The NRJ-CF is unable to increase volume on the telephone.

l.       Defendant has a combat related hearing loss which requires the use of VA supplied hearing aids.  The NRJ-CF has consistently forced defendant to go as long as 10 days without fresh batteries.

m.       The pre-arraignment/detention hearing probation officer's report was prejudicial

6

to the defendant in that it gave false and misleading information about defendant so that bail would be denied.

      n.     In scheduling this and related cases for trial, the Government has racially selected defendant and two African-American co-defendants to be tried first, knowing that statistically they would enhance their prosecution in all four cases by trying the African-American defendants first.

      o.     In order to have even five hours of law library research, the defendant is forced to do research on the Sabbath which is a violation of religious beliefs, even though the defendant has repeatedly requested he not be scheduled on the Sabbath.

      p.     Inadequate and outdated research material at the NRJ-CF law library denies the defendant an opportunity to adequately prepare his defense or to research the issues.

      q.     The Government denied the defendant his constitutional right to vote in the November 1996 general election, even though he repeatedly requested an absentee ballot so that he could vote.

A prisoner is entitled to the writ of habeas corpus when, though lawfully in custody, he is deprived of some right to which he is lawfully entitled even in his confinement, the deprivation of which serves to make his imprisonment more burdensome than the law allows, or curtails his liberty to a greater extent than the law permits. *Coffin v. Reichard*, 142 F.2d at 445 (1944)

      3.     THE GOVERNMENT HAS MISUSED THE GRAND JURY PROCESS BY ATTEMPTING TO UTILIZE ITS SUBPOENA POWER TO GAIN DISCOVERY IN THIS CASE

In *United States V. (Under Seal) In re Antitrust Grand Jury Investigations*, 714 F.2d 347 (4th Cir. 1983) the Fourth Circuit Court of Appeals stated:

7

. . .the grand jury serves an independent investigatory function and is "not meant to be the private tool of the prosecutor." *United States v. Fisher*, 455 F.2d 1101, 1105 (2 Cir. 1972). Thus, practices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden. **This includes use of the grand jury by the prosecutor to harass witnesses or as a means of civil or criminal discovery.** (Footnotes and citations omitted)(emphasis supplied)

*Id*., at 3349-350. And in *United States v. Moss*, 756 F.2d 329 (4th Cir. 1985), the Court stated that "it is the universal rule that prosecutors cannot utilize the grand jury solely or even primarily for the purpose of gathering evidence in pending litigation." *Id*., at 332.

This defendant submits that the Government may have done exactly what has been prohibited by using its subpoena power to command the attendance of Chi-anna Looker and Butch Paugh at the grand jury on February 3, 1997. Of course, due to the secret nature of the grand jury, it is impossible for this Court to determine what purpose the Government had in mind when it attempted to elicit testimony from the defendant's wife and Rev. Butch Paugh without examining the transcripts. However, this defendant believes that the witnesses referred to herein were subpoenaed to the February 3 grand jury the primary purpose of obtaining discovery in this case and/or the other indictments currently pending. Accordingly, an examination of the transcripts is clearly warranted.

4)    THE GOVERNMENT HAS SPECIFICALLY TARGETED THIS DEFENDANT AND CERTAIN CO-DEFENDANTS SOLELY BECAUSE OF MEMBERSHIP IN PATRIOT GROUPS

The militia had been, in fact, a target of FBI and other federal agencies as early as 1994. This was further evidenced by the testimony of FBI Agent J. C. Raffety in the preliminary hearing of October 17, 1996. Mr. Raffety, in answer to a question by Mr. Godwin (AUSA) or direct examinations, answered:

8

A.      "Several days before December 28th, maybe a week or more before December 28th, I became aware that <u>another government agency, another law enforcement agency, was conducting an investigation into the operations of the Mountaineer Militia.</u> And they had in fact sent an undercover police officer — or not so undercover police officer — to the various training locations for purposes of gathering evidence."

Q.      The Militia knew this individual was a police officer, is that right?

A.      That is correct.  The militia knew him to be a police officer.

Q.      But they believed he was more sympathetic to their cause.

A.      Yes, they believed that he in fact was sympathetic to their cause.

Q.      How did that figure into your handling this investigation on December 28th?

A.      That police officer was not aware of the FBI's investigation into the Militia.

Again beginning with the last question on page 36 of the transcript of the preliminary hearing of October 17, 1996:

Q.      And just to make sure that we got things clear here, there are three individuals who are assisting you in — I guess you could call it an infiltrator or undercover capacity, is that right?

A.      No.  Two were assisting me and one was receiving information from through another federal agency .

Q.      The two that were assisting you were the CW, Mr. Richards, who you testified earlier about?

A.      That's correct.

Q.      And the undercover broker, that really was a Special Agent of the Federal Bureau

9

of Investigation, correct?

      A.     He was a Special Agent with the Federal Bureau of Investigation who had special training in undercover activities.

      Q.     And the third individual was the police officer that you were aware of that was sent in by someone else?

      A.     Yes.  he was referred to as a confidential source.

      Q.     Now, I also want to make it clear as to the nature of this investigation.  <u>Was this an investigation of the Mountaineer Militia?</u>

      A.     <u>It was not.</u>

      Q.     What was this an investigation of?

      A.     It was an investigation of alleged reported criminal conduct on the part of individuals who were members of the Mountaineer Militia, or associates of the Mountaineer Militia.

According to the preliminary hearing transcript of 10/17/96, page 21, Okey Richards, the informant received instructions to attend a meeting between CW, Mr. Looker and Mr. Rogers.

      A.     He [Okey Richards] advised that the reason for the meeting was a concern that Mr. Rogers had as to an article appearing in a magazine that is called the <u>The Spotlight</u> which is a magazine familiar to the Militia.  They read it and <u>they subscribe to it.</u>

The article appearing in the August 28th issue, I believe, was in regard to a plan for the President of the United States to sign a counter-terrorism bill which, according to the article, would authorize the Federal Government to make a sweep of the United States and to arrest any and all Militia members.

10

Mr. Rogers expressed concern to General Looker to the CW as to (1) were they were aware of this article and (2) were they not concerned about their own safety if such a bill was passed and such a sweep by the federal authorities was made.

*

The foregoing discussions as federal and local involvement in these investigations were initiated against the West Virginia Mountaineer Militia, even though Mr. Raffety indicated that it was not an investigation of the militia. [page 37 of transcript]

The defendant finds this most difficult to believe in light of the foreknowledge that the patriot movement had three months in advance that the Federal Government was going to do something to discredit the militia movement before the Oklahoma City Federal Building bombing. The subsequent demonizing of the militia in the media, when it has successfully been proven that no militia had a part in that operation, as well as the FBI's immediate response by targeting militia and other patriot groups for investigations is evident within a week following the Oklahoma City bombing on April 19, 1995.  The FBI investigated the West Virginia Mountaineer Militia and within a couple of weeks after that, under the instructions of the case Agent J. C. Raffety, Okey Marshall Richards appears on the scene, initiating a federal investigation into the West Virginia Mountaineer Militia.

Agent Raffety stated that the militia was never a target of a federal investigation or undercover operation, but he will readily admit that he maintained constant and daily contact with the informant Okey Richards, to be sure he was doing what he was instructed to do and for which he was being paid a handsome payment for his services and expenses.

On the day of the FBI sting operation against the Militia — October 11, 1996, federal

11

agents as well as The United States Attorney, set forth to demonize the militia in the media, while at the same time attempting to prosecute its members and affiliates as common criminals in the Courts. This, in effect, amounted to a double trial, once in the media to gain public support for the Government's outrageous misconduct, and secondly in the Courts to imprison defendants--as long as humanly possible.

In *United States v. Turner*, 104 F.3d 1180 (1997) and *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed. 2d 547 (1985), the Court ruled that to succeed as a defense, the defendant "must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." The kind of intent to be proven is that the government undertook a particular course of action "at lease in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Wayte v. United States*, 610, 105 S.Ct. at 1532.

It goes without question that the Government was attempting to "put some teeth" in the anti-terrorist law, 18 U.S.C. 2339A, and that the West Virginia Mountaineer Militia was targeted for that purpose.

It is also clearly shown that the West Virginia Mountaineer Militia was selected for an ongoing "sting" operation because the Government maintained control of the organization throughout the "investigation" and knew it was vulnerable, easily controlled and easily influenced.

The defendant himself was specifically targeted because he was the Commander of the Militia and most easily influenced by his "perceived" friendship with the FBI informant Okey Marshall Richards, as well as the defendant's economic vulnerability.

12

WHEREFORE, the defendant requests this Court issue a Writ of Habeas Corpus; dismiss the indictment; release the defendant, and any other relief this Court deems just and proper.

Respectfully submitted this _9_ day of April, 1997.

FLOYD RAYMOND LOOKER, JR.

*pro se*

## CERTIFICATE OF SERVICE

Service of the foregoing Motion was had upon the following by mailing a true copy, by United States mail, postage prepaid, this _15_ day of April, 1997.

By: _____
William Cipriani, Standby Counsel for
Floyd Raymond Looker, Jr.

David Godwin
First Assistant United States Attorney
P.O. Box 750
Clarksburg, WV  26303-0750
Counsel for the Government

Gary B. Zimmerman, Esq.
100 Ross Street
Suite 304
Pittsburgh, PA 15219
Counsel for James Rogers

13