

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

**U.S. DISTRICT COURT**
**FILED AT WHEELING, WV**

**MAY -2 1997**

**NORTHERN DISTRICT OF WV**
**OFFICE OF THE CLERK**

**UNITED STATES OF AMERICA,**
**PLAINTIFF,**

**v.**                                          **CRIMINAL NO.  1:96CR43-01**

**FLOYD RAYMOND LOOKER, a/k/a Ray,**
**DEFENDANT.**

## UNITED STATES' RESPONSE TO DEFENDANT'S
## VARIOUS PRETRIAL MOTIONS

Comes now the United States of America and William D. Wilmoth, United States Attorney

for the Northern District of West Virginia, by David E. Godwin, First Assistant United States

Attorney, and responds to the defendant's various pretrial motions by stating the following:

**I.      Motion for Grand Jury Transcripts;** *(71 - 1)*
**Motion for Disclosure of Impeaching Evidence:** *(71 - 4)*
**Motion for Notes by the Government of the Intention to Rely upon Other Evidence of**
**Uncharged Crimes:** *(71 - 6)*

1. The United States will provide Jencks material, Giglio material, and notice of the nature

of any Rule 404(b) evidence on or before the date already ordered by the Court.

**II.     Motion of Defendant to Hire an Explosive Expert and for Independent Testing of**
**Evidence:** *(71 - 8)*

1. To the extent the motion seeks funds to obtain the assistance of an expert, the United

States has no standing to take a position in that such petition can be made ex parte under Title 18,

United States Code, §3006A(e)(1).

1

2. To the extent that the motion seeks samples of the government's evidence for the purpose of testing, there are no explosives to test in this case

### III.   Motion to Require the Government to Produce Witness: *(¶ ¶ · ¶)*

1. The United States does not claim any right to interfere in the defendant's access to any witness other than the right to not disclose identities of witnesses until such time as has heretofore been ordered.

2. The United States Attorney will not disclose, or cause to be disclosed, the present location of Marshall Richards. Such would endanger Mr. Richards' safety. Mr. Richards is not in the custody of the government but has been relocated to an undisclosed location for his safety. A copy of a wanted poster circulated by the wife of the defendant is attached as Attachment One to illustrate that the perceived danger is reasonable.

3. The undersigned has met with Mr. Richards since this motion was filed. At that meeting, Mr. Richards was told of the request. He was told that he was free to talk to whomever he chose or to refuse to talk to whomever he chose. He was not advised by the undersigned or by the FBI Special Agent in attendance as to what decision he should make. Mr. Richards indicated that he did not want to be interviewed by the defendant or his counsel. He stated that he would be willing to discuss this matter with either the Magistrate Judge or defense counsel on the telephone but that he did not want to appear in person.

4. Contact with Mr. Richards can be made by contacting FBI Special Agent J. C. Raffety.

5. Since the filing of this motion, the Magistrate Judge has entered an order, the substance of which requires the government to make Mr. Richards available and further orders that Mr. Richards meet face to face with defense counsel and specifically specifies that no government personnel are to be present.

2

6.  Such order is inappropriate and should not be entered in this case.

7.  Such order is inappropriate in that it orders the government to do t hat which the government has agreed to do; that is, making Mr. Richards available.  The order erroneously states that the witness is in the custody of the government.  There is no evidence to support such a finding.

8.  Most importantly, the order is inappropriate in that its extent exceeds the bounds of the motion and of the Court's authority.  To the extent it requires a face-to-face meeting with defense counsel and further to the extent it dictates under what circumstances (who may be present) the meeting must occur, the order is not directed at the United States Attorney or the Federal Bureau of Investigation, but is directed at Mr. Richards personally.  The United States Attorney and the Federal Bureau of Investigation do not have the lawful capacity to cause such a meeting.  Mr. Richards is not subject to any lawful process of the Court and it accordingly is not appropriate to infringe upon his liberty by ordering him to meet with individuals of the Court's choosing and under conditions chosen by the Court.

9.  Mr. Richards and the government personnel involved in this case have made a sincere effort to act appropriately and cooperatively on this issue.

10.  Accordingly, the United States has no objection to granting the motion to the extent it seeks to have the government produce Mr. Richards for the purpose of defense inquiry.  The United States, however, does object to an overreaching order that purports to take control of Mr. Richards without any proper process or basis.

## IV.   Motion to Select Jurors from Entire Northern District:  (71 - 5)

1.  The petit jury in this case should be selected by the approved Jury Selection Plan for the district.

2.  The defendant claims that he has some right to a district-wide jury panel in order to avoid

3

the exclusion of low income persons from his jury. He cites demographic information in support of his motion.

3. This same issue was addressed by the Fourth Circuit in United States v. Florence, 456 F.2d 46 (4th Cir. 1972). In the Florence case, the defendant complained that he did not receive a trial by a jury of his peers because he was tried in the Elkins division which excluded persons from the then existing Parkersburg division, in which he resided and in which he allegedly committed his crimes. Florence claimed that the individuals residing in the Elkins area were different in their economic and sociological background to persons from Parkersburg. The Fourth Circuit concluded that Florence had "neither a constitutional nor statutory right to a district-wide jury nor a jury selected from the Parkersburg 'division.'" (p. 50). The Florence case is on point and is controlling authority for the issue raised by this motion.

4. The defendant complains that low-income people will be under represented and that he therefore will not have a fair-cross-section of the community on his jury.

> "[T]he Supreme Court has held 'the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial.' [citations omitted] The fair-cross-section inquiry has three components: '[i]n order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.' Duren v. Missouri, 439 U.S. 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)" quoted from Davis v. Warden, 867 F.2d 1003, 1006 (7th Cir. 1989).

The Defendant has not alleged or shown that "low income persons" are a distinctive group. Nor has he attempted to meet the other two criteria.

5. The defendant claims that a jury selected from the Wheeling division will be too "urban" to reflect his community. The crimes in this and related cases with which he is charged, occurred

primarily in the Wheeling area and the Clarksburg area. These are among the "urban" areas in his demographic information. The defendant was a resident of Stonewood in Harrison County; again, one of the "urban" counties. The "rural" counties of the district are primarily to the south and the east of Harrison County; these "rural" counties are not shown to have any relationship to the defendant or his alleged criminal acts.

    6. The defendant's motion is without any merit and should be denied.

## V.    **Motion for Bill of Particulars:** ( 71 - 3 )

    1. Ordinarily, the function of a bill of particulars is not to provide "detailed disclosure of the government's evidence in advance of trial" but to supply "any essential detail which may have been omitted from the indictment" (citations omitted). United States v. Anderson, 481 F.2d 685, 690 (4th Cir. 1973).

    2. A bill of particulars is not an investigative vehicle for the defense and is not available as a tool "to obtain detailed disclosure of the government's evidence prior to trial." United States v. Kilrain, 566 F.2d 985 (5th Cir.) cert. denied, 439 U.S. 819 (1978).

    3. The government objects to answering a Bill of Particulars because such answers are required only where necessary to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense, to avoid or minimize the danger of surprise at trial, or to enable him to plead his acquittal or conviction in bar of further prosecution for the same offense.

    4. The defendant has been informed of the charge through an allegation that contains all of the elements. He has the benefit of extensive discovery. No clarification is necessary.

    5. The United States is willing to answer most of the defendant's questions but only as voluntary discovery that exceeds the requirements of Rule 16 and the local rules. Accordingly, the

following information is provided.

    a. The only co-conspirators known to the government are the two named defendants..

    b. The government only knows the participants as being 26 county commanders.

    c. James Richard Rogers

    d. James Richard Rogers

    e. Steven Franke

    f. O. Marshall Richards at the request of Floyd Raymond Lewis to negotiate the brokering of additional "candles" to be obtained from James M. Johnson.

    g. O. Marshall Richards at the request of Floyd Raymond Looker for the purpose of having Rogers explain, in detail, the significance of the FBI\CJIS blueprint photos which had previously been provided to Richards from Rogers.

    h. August 29, 1995  - Veteran's Park near the Veteran's Administration Medical Center in Clarksburg, WV

December 28, 1995 - Tucillos' Restaurant, Rosebud Plaza, Clarksburg, WV

February 5, 1996 - Northbound rest stop on Interstate 79, just north of Clarksburg, WV

March 7, 1996 - 318 ½ Washington Avenue, Clarksburg, WV

    i. Photographs taken by Floyd Raymond Looker and typed pages with general information relating to the FBI/CJIS facility.

    j. Steven Franke.

    k. The defendant has already received tape recordings that contain these statements.

    l. The materials sold by Floyd Raymond Looker to Steven Franke on October 11, 1996 were within the definition as "other physical assets."

**VI.    Motion to Require Government Provide Complete Transcripts of Audio Tapes:** *( 71 - 2 )*

1. The United States has provided to the defendant copies of all of the transcripts it has. These were provided early in discovery because copies of the audio and video tapes were not then available.

2. Subsequent to the delivery of the transcripts, the defendant has now received a copy of all of the audio and video tapes.

3. Transcripts of the portions of the tapes that are selected by the prosecution to play for the jury will be made available before the trial.  Those transcripts will be improved versions of the transcripts previously delivered and may include other passages which were not earlier transcribed.

4. The United States has already exceeded the requirements of Rule 16.

5. The defendant is free to transcribe any portion of the recordings that he desires.

**VII.   Application for Writ of Habeas Corpus and Motion To Dismiss Indictment:** *( 8 ) (91 - 9 )*

1. The defense of outrageous governmental conduct is easily alleged but usually, as in this case, without substance or effect.

2. The following passage from United States v. Voigt, 89 F3d 1050, 1065 (3rd Cir. 1996) is a useful backdrop to the government's response to the far reaching allegations contained in the defendant's motion.

> "We have also noted that the judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.  In United States v. Jannotti, 673 F.2d 578 (3rd Cir.) (in banc) cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed. 2d 1315 (1987), we observed that 'the majority of the Court has manifestly reserved for the constitutional defense only the most intolerable conduct.' Id. at 608.  Relying on well-settled separation-of-powers principles, we cautioned that '[w]e must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable . . . Unless the behavior of the F.B.I. agents rose to the level of outrageousness which would bar conviction, the conduct of agents of the executive branch who must protect

7

the public from crime is more appropriately considered through the political process where divergent views can be expressed in the ballot box.  Id. at 607, 609. . . As a result, the doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by courts."

3.  The government's conduct in this and related cases in neither outrageous, nor intolerable nor offensive.  The defendant's motion is merely a collection of conclusory allegations; and in order to obtain an evidentiary hearing, he must allege facts, not conclusory allegations.

4.  The first part of the defendant's memorandum ' contains a disjointed and ineffectual attempt to allege entrapment.  The defendant's allegation that no criminal activity occurred before Marshall Richards became involved in the militia is irrelevant to the case.  In this regard, the motion is impossible of proof since it would require the proof of a negative.  He additionally alleges that Richards "planted idea after idea into the minds of the militia members."  While the government denies the truth of the defendant's allegation, it is important to point out that the allegation does not support a defense of entrapment and therefore certainly doesn't substantiate his allegation of outrageous conduct.

5.  The supervising F.B.I. agent, J. C. Raffety, followed "The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations," (a copy of which is attached as Attachment Two) in conducting this overall investigation.  As the attached guidelines reflect, this investigative activity is highly regulated.  Eventually, eight investigations were opened as a result of the activities of the individuals in the militia.  A brief overview of these are as follows:

| Subjects | Type of Activity | Charged/Uncharged |
|---|---|---|
| 1. Leroy Schweitzer, Floyd Looker & others | Fraudulent checks | Not charged as yet |

| | | |
|---|---|---|
| 2. Floyd Raymond Looker<br>Terry Coon | Explosives | Has been charged |
| 3. James Johnson<br>Floyd Raymond Looker | Explosives | Has been charged |
| 4. Wilbert A. Conrad | Initial Explosives | Has been charged on felon in possession of firearms charge |
| 5. James C. McClung | Murder for Hire | Information has been sent to court pursuant to plea agreement |
| 6. James Richard Rogers<br>and others | Conspiracy to destroy public property (sabotage) | Has been charged |
| 7. Floyd Raymond Looker<br>Jack Arland Phillips<br>Edward Frederick Moore | Explosives | Has been charged |
| 8. Chi-Anna Looker & others | Obstruction of Justice | No charges have been filed (ongoing investigation) |

6. Marshall Richards was a subordinate of the defendant in the militia and carried out the defendant's will. The defendant admitted this when he was interviewed on October 11, 1996. He has now elected to assert that he, somehow, was victimized by Richards. He has not alleged any alleged facts in support of this allegation.

7. The allegations contained in paragraphs a through g of the second section of the defendant's motion are primarily complaints about the conditions of his confinement. Incarceration is, by definition, a restriction of the defendant's liberty. In any event, nearly all of these complaints should be raised with his custodian and have nothing to do with the nature of the investigaion and prosecution in this case.

8. In the first four allegations (a through d), he cites that "The Government" has taken certain action against him. These allegations contain a misapprehension of the various arms of the government as a monolithic actor. The defendant didn't receive Prozac because of the medical

9

doctor's opinion and had nothing to do with the defendant's imaginary claim that the prosecution was trying to destabilize him.

9.   The allegations in a through d are false.  They are conclusory allegations and allege no facts upon which they are supposedly based.  The United States Attorney and the F.B.I. have no information about or connection with the matters raised in e. through l. and o. through q. Subparagraph m. does not identify which facts in the probation officer's report are alleged to be false; and, accordingly, no determination can be made as to whether it has any merit.  The United States Attorney is not aware of any false information as alleged in m.  The allegation in subparagraph n. is misdirected for the reason that the Court established the sequence of the trials.  The prosecution has not acted out of any racial motive and has no reason to believe that the Court has done so.

10.   The allegation contained in section three of the defendant's motion related to the use of the grand jury is false.  The grand jury process has not been abused.  Attachment One is a wanted poster for one of the government's witnesses.  It clearly provides an adequate predicate for further investigation as an attempt to interfere with a witness.

11.   The United States has not targeted anyone solely because of membership in a "patriot group" as alleged in section four of the motion.  The excerpt of the transcript of the preliminary hearing recited in the motion on pages 9 and 10 is misleading.  The defendant, in his motion, failed to indicate that "December 28th" is referring to the year 1995.  By that time, the defendant had already engaged in illegal transportation of explosives with Terrell Coon, James Johnson and Imam Lewis.  He had also already "targeted" the FBI CJIS facility and was attempting to obtain 'intelligence' information from James R. Rogers.

12.   The United States Attorney specifically denies waging a press campaign against the defendant.  The contacts with the press have been handled in accordance with routine procedures and

10

have been limited to the public record.  The defendant and some of his co-defendants have engaged in the tactic he alleges against the government.  The allegation that "the Government was attempting to 'put some teeth' in" Title 18, United States Code, §2339A is false.  It is a new statute with which the United States Attorney was not familiar with during the pendency of the investigation.  It was selected for use in this case in or around August or September of 1996  because the elements of §2339A best fit the facts of the conduct of the defendant Looker and his co-defendant Rogers.

13.  The motion should be denied without an evidentiary hearing.

## VIII.  Motion to Suppress: (¶¶)

1.  The motion cites no authority for the suppression of evidence.

2.  The burden is on the defendant to show an illegality that the law would recognize as a proper basis for the withholding of otherwise probative evidence from a jury.

3.  The defendant claims that the F.B.I. opened its investigation too soon in violation of paragraph (c) of Title 18, United States Code, §2339A, which stated (prior to April 24, 1996) as follows:

> **(c)  Investigations**
>
> **(1)  In general** - Within the United States, an investigation may be initiated or continued under this section only when facts reasonably indicate that--
>
> **(A)** in the case of an individual, the individual knowingly or intentionally engages, has engaged, or is about to engage in the violation of this or any other Federal criminal law; and
>
> **(B)** in the case of a group of individuals, the group knowingly or intentionally engages, has engaged, or is about to engage in the violation of this or any other Federal criminal law.
>
> **(2) Activities protected by the First Amendment**.--An investigation may not be initiated or continued under this section based on activities protected by the First Amendment to the Constitution, including expressions of support or the provision of financial support for the nonviolent political, religious, philosophical, or ideological

goals or beliefs of any person or group.

4. Paragraph (c) of §2339A, quoted above, was removed from the statute by an amendment which became effective on April 24, 1996. The removal of the provision is of little importance since the provision was surplusage. The statutory provision was no more stringent than the normal standards in criminal investigations; as, in this case, are set out in the attached Attorney General's guidelines.

5. The first investigative activity in regard to the Mountaineer Militia is the "preliminary inquiry" that Special Agent Raffety requested the authority to open by a memorandum to the Special Agent in Charge of the Pittsburgh Division dated May 30, 1995. A copy of the memorandum is attached as Attachment Three. The memorandum sets forth the basis upon which the inquiry was opened. A preliminary inquiry is limited in its duration and in the techniques employed (see II.B. Preliminary Inquiries on pages 4-6 of Attachment Three). As a result of this inquiry and subsequent domestic security/terrorism investigations resulting therefrom, the eight investigations listed in the government's response to the defendant's motion to dismiss were eventually opened.

6. The defendant has not alleged that his First Amendment rights have been interfered with and, in fact, they have not. The statements by Looker which were used as a predicate for the inquiry were ones that indicated a likelihood of criminal activity. This is not an infringement of any rights just as speech such as "fighting words," yelling fire in a theater; threatening the President; etc., are not protected by the First Amendment. The defendant's statements are admissible in evidence in a jury trial; surely, they are a suitable predicate for an investigation if they give rise to a reasonable indication that criminal activity may be afoot.

7. The defendant has not presented any basis for the suppression of evidence in his motion. The investigators have not infringed upon his rights and have not violated the law in acquiring

12

evidence of the defendant's guilt.  The granting of the motion would be an injustice.  The motion should be denied without an evidentiary hearing.

Respectfully submitted,

UNITED STATES OF AMERICA

WILLIAM D. WILMOTH
UNITED STATES ATTORNEY

By: _David E. Godwin_____

David E. Godwin
First Assistant United States Attorney

13

## CERTIFICATE OF SERVICE

I, David E. Godwin, First Assistant United States Attorney for the Northern District of West Virginia, do hereby certify that the foregoing UNITED STATES' RESPONSE TO DEFENDANT'S VARIOUS PRETRIAL MOTIONS was served upon the defendant by placing a copy thereof in the United States Mail, postage prepaid, addressed to Gary B. Zimmerman, counsel for James R. Rogers, Suite 304, 100 Ross Street, Pittsburgh, Pennsylvania 15219, and William Cipriani, counsel for Floyd Raymond Looker, 634 Charles Street, Wellsburg, West Virginia 26070.

Dated this 2nd day of May, 1997.

David E. Godwin
First Assistant U. S. Attorney
Post Office Box 750
Clarksburg, WV   26302-0750

NOV-01-1996  10:19        FBI CLARKSBURG WV                    304 624 6212    P.02

NOV-01-1996  10:02        LOOKER H2S                           304  624 6006  P.01

# MOST WANTED

### By American Patriots

Oct 11, This man <u>plan along</u> to bomb
Figure Print Identification Complex, Clarksburg,
West Virginia,  in order to setup for FBI to Destroy
West Virginia Mountaineer Militiamen
Gen. Ray Looker and others 6 men.



**Age:** 45               **Hair:** Light Brown combed straight back
**Tall:** 6'6"            **Eyes:** Light Green
**Weight:** 270 pbs       **Mustache:** Yes
**Wife:** Carolyn Gabber  **Stepdaughter & Stepson:** Christin & Ryan
                          **Career:** Super Salesman, Marketing Consultant,
                          Security System Consultant,
                          *Alternate Fuels Industry spy*

## Message To Marshall Richard:

You have been dishonorably discharged for violations oath of membership and
oath of office as an officer of the militia.   --- *Commanding General - Ray Looker*

You are a traitor, paid prostitute. I think you should get criminal charge for traitor to
American people.                                     • • • • • • *Butch Paugh*

A false witness will not go unpunished, and he who tells lies will not escape.
                          ---*Proverbs 19:5,   Chi-Anna Looker*

*LEGAL PAPER*
*9½" x 11"*

ATTACHMENT ONE



## Office of the Attorney General
### Washington, D.C. 20530

THE ATTORNEY GENERAL'S GUIDELINES ON GENERAL CRIMES,
RACKETEERING ENTERPRISE AND
DOMESTIC SECURITY/TERRORISM INVESTIGATIONS

As the primary criminal investigative agency in the federal government, the FBI has the authority and responsibility to investigate all criminal violations of federal law not exclusively assigned to another federal agency. The FBI thus plays a central role in national law enforcement and in the proper administration of justice in the United States.

Investigations by the FBI are premised upon the important duty of government to protect the public against general crimes, against organized criminal activity, and against those who would engage in political or racial terrorism or would destroy our constitutional system through criminal violence. At the same time, that duty must be performed with care to protect individual rights and to insure that investigations are confined to matters of legitimate law enforcement interest. The purpose of these Guidelines, therefore, is to establish a consistent policy in such matters. The Guidelines should encourage Agents of the FBI to perform their duties with greater certainty, confidence and effectiveness. They should also give the public a firm assurance that the FBI is acting properly under the law.

These Guidelines provide guidance for all investigations by the FBI of crimes and crime-related activities. Investigations involving foreign intelligence, foreign counter-intelligence and international terrorism matters are the subject of separate guidelines. The standards and requirements set forth herein govern the circumstances under which an investigation may be begun, and the permissible scope, duration, subject-matters, and objectives of an investigation.

# ATTACHMENT TWO

- 2 -

All investigations of crime or crime-related activities shall be undertaken in accordance with one or more of these Guidelines. Part I sets forth general principles that apply to all investigations conducted under these Guidelines. Part II governs investigations undertaken to detect, prevent and prosecute specific violations of federal law. Part III A governs criminal intelligence investigations undertaken to obtain information concerning enterprises which are engaged in racketeering activities involving violence, extortion, narcotics or public corruption. Part III B governs criminal intelligence investigations undertaken to obtain information concerning enterprises which seek to achieve political or social change through violence.

These Guidelines are issued under the authority of the Attorney General as provided in 28 U.S.C. 509, 510, and 533.

## CONTENTS

I.      General Principles

II.     General Crimes Investigations

        A.   Definitions
        B.   Preliminary Inquiries
        C.   Investigations

III.    Criminal Intelligence Investigations

        A.   Racketeering Enterprise Investigations

             1.   Definitions
             2.   General Authority
             3.   Purpose
             4.   Scope
             5.   Authorization and Renewal

        B.   Domestic Security/Terrorism Investigations

             1.   General authority
             2.   Purpose
             3.   Scope
             4.   Authorization and Renewal

IV.     Investigative Techniques

V.      Dissemination

VI.     Cooperation with Secret Service

VII.    Reservation

- 3 -

## I.   General Principles

Preliminary inquiries and investigations governed by these Guidelines are conducted for the purpose of preventing, detecting, or prosecuting violations of federal law.  They shall be conducted with as little intrusion into the privacy of individuals as the needs of the situation permit.

All preliminary inquiries shall be conducted pursuant to the General Crimes Guidelines.  There is no separate provision for a preliminary inquiry under the Criminal Intelligence Guidelines.  A preliminary inquiry shall be promptly terminated when it becomes apparent that a full investigation is not warranted.  If, on the basis of information discovered in the course of a preliminary inquiry, an investigation is warranted, it may be conducted as a general crimes investigation, or a criminal intelligence investigation, or both.  All such investigations, however, shall be based on a reasonable factual predicate and shall have a valid law enforcement purpose.

In its efforts to anticipate or prevent crime, the FBI must at times initiate investigations in advance of criminal conduct.  It is important that such investigations not be based solely on activities protected by the First Amendment or on the lawful exercise of any other rights secured by the Constitution or laws of the United States.  When, however, statements advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence, an investigation under these Guidelines may be warranted unless it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm.

General crimes investigations and criminal intelligence investigations shall be terminated when all logical leads have been exhausted and no legitimate law enforcement interest justifies their continuance.

Nothing in these Guidelines is intended to prohibit the FBI from collecting and maintaining publicly available information consistent with the Privacy Act.

Nothing in these Guidelines prohibits the FBI from ascertaining the general scope and nature of criminal activity in a particular location or sector of the economy.

- 4 -

## II.   General Crimes Investigations

### A.   Definitions

(1)   "Exigent circumstances" are circumstances requiring action before authorization otherwise necessary under these guidelines can reasonably be obtained, in order to protect life or substantial property interests; to apprehend or identify a fleeing offender; to prevent the hiding, destruction or alteration of evidence; or to avoid other serious impairment or hindrance of an investigation.

(2)   "Sensitive criminal matter" is any alleged criminal conduct involving corrupt action by a public official or political candidate, the activities of a foreign government, the activities of a religious organization or a primarily political organization or the related activities of any individual prominent in such an organization, or the activities of the news media; and any other matter which in the judgment of a Special Agent in Charge (SAC) should be brought to the attention of the United States Attorney or other appropriate official in the Department of Justice, as well as FBI Headquarters (FBIHQ).

### B.   Preliminary Inquiries

(1)   On some occasions the FBI may receive information or an allegation not warranting a full investigation -- because there is not yet a "reasonable indication" of criminal activities -- but whose responsible handling requires some further scrutiny beyond the prompt and extremely limited checking out of initial leads.  In such circumstances, though the factual predicate for an investigation has not been met, the FBI may initiate an "inquiry" involving some measured review, contact, or observation activities in response to the allegation or information indicating the possibility of criminal activity.

This authority to conduct inquiries short of a full investigation allows the government to respond in a measured way to ambiguous or incomplete information and to do so with as little intrusion as the needs of the situation permit.  This is especially important in such areas as white-collar crime where no complainant is involved or when an allegation or information is received from a source of unknown reliability.  It is contemplated that such inquiries would be of short duration and be confined solely to obtaining the information necessary to make an informed judgment as to whether a full investigation is warranted.

- 5 -

A preliminary inquiry is not a required step when facts or circumstances reasonably indicating criminal activity are already available; in such cases, a full investigation can be immediately opened.

(2)  The FBI supervisor authorizing an inquiry shall assure that the allegation or other information which warranted the inquiry has been recorded in writing.  In sensitive criminal matters, the United States Attorney or an appropriate Department of Justice official shall be notified of the basis for an inquiry as soon as practicable after the opening of the inquiry, and the fact of notification shall be recorded in writing.

(3)  Inquiries shall be completed within 90 days after initiation of the first investigative step.  The date of the first investigative step is not necessarily the same date on which the first incoming information or allegation was received.  An extension of time in an inquiry for succeeding 30-day periods may be granted by FBI Headquarters upon receipt of a written request and statement of reasons why further investigative steps are warranted when there is no "reasonable indication" of criminal activity.

(4)  Before employing an investigative technique in an inquiry, the FBI should consider whether the information could be obtained in a timely and effective way by less intrusive means.  Some of the factors to be considered in judging intrusiveness are adverse consequences to an individual's privacy interests and avoidable damage to his reputation.  Whether an intrusive technique should be used in an inquiry depends on the seriousness of the possible crime and the strength of the information indicating the possible existence of the crime.  However, the techniques used in an inquiry should generally be less intrusive than those employed in a full investigation.  It is recognized that choice of technique is a matter of judgment.

(5)  The following investigative techniques shall not be used during an inquiry:

(a)  Mail covers;

(b)  Mail openings;

(c)  Nonconsensual electronic surveillance or any other investigative technique covered by Title 18 U.S.C. 2510-2521.

- 6 -

(6)  The following investigative techniques may be used in an inquiry without any prior authorization from a supervisory agent:

(a)  Examination of FBI indices and files;

(b)  Examination of records available to the public and other public sources of information;

(c)  Examination of available federal, state and local government records;

(d)  Interview of the complainant, previously established informants, and confidential sources;

(e)  Interview of the potential subject;

(f)  Interview of persons who should readily be able to corroborate or deny the truth of the allegation, except this does not include pretext interviews or interviews of a potential subject's employer or co-workers unless the interviewee was the complainant;

(g)  Physical or photographic surveillance of any person.

The use of any other lawful investigative technique that is permitted in an inquiry shall meet the requirements and limitations of Part IV and, except in exigent circumstances, require prior approval by a supervisory agent. Where a technique is highly intrusive, a supervisory agent shall approve its use in the inquiry stage only in compelling circumstances and when other investigative means are not likely to be successful.

(7)  Where a preliminary inquiry fails to disclose sufficient information to justify an investigation, the FBI shall terminate the inquiry and make a record of the closing. In a sensitive criminal matter, the FBI shall notify the United States Attorney of the closing and record the fact of notification in writing. Information on an inquiry which has been closed shall be available on request to a United States Attorney or his designee or an appropriate Department of Justice official.

(8)  All requirements regarding inquiries shall apply to reopened inquiries. In sensitive criminal matters, the United States Attorney or the appropriate Department of Justice official shall be notified as soon as practicable after the reopening of an inquiry.

- 7 -

C.  Investigations

(1)  A general crimes investigation may be initiated by the FBI when facts or circumstances reasonably indicate that a federal crime has been, is being, or will be committed.  The investigation may be conducted to prevent, solve, and prosecute such criminal activity.

The standard of "reasonable indication" is substantially lower than probable cause.  In determining whether there is reasonable indication of a federal criminal violation, a Special Agent may take into account any facts or circumstances that a prudent investigator would consider.  However, the standard does require specific facts or circumstances indicating a past, current, or impending violation.  There must be an objective, factual basis for initiating the investigation; a mere hunch is insufficient.

(2)  Where a criminal act may be committed in the future, preparation for that act can, of course, amount to a current criminal violation under the conspiracy or attempt provisions of federal criminal law, if there are present the requisite agreement and overt act, or substantial step toward completion of the criminal act and intention to complete the act.  With respect to criminal activity that may occur in the future but does not yet involve a current criminal conspiracy or attempt, particular care is necessary to assure that there exist facts and circumstances amounting to a reasonable indication that a crime will occur.

(3)  The FBI supervisor authorizing an investigation shall assure that the facts or circumstances meeting the standard of reasonable indication have been recorded in writing.

In sensitive criminal matters, as defined in paragraph A(2), the United States Attorney or an appropriate Department of Justice official and FBIHQ shall be notified in writing of the basis for an investigation as soon as practicable after commencement of the investigation.

(4)  The Special Agent conducting an investigation shall maintain periodic written or oral contact with the appropriate federal prosecutor, as circumstances require and as requested by the prosecutor.

When, during an investigation, a matter appears to arguably warrant prosecution, the Special Agent shall present the relevant facts to the appropriate federal prosecutor.  In every sensitive

- 8 -

criminal matter, the FBI shall notify the appropriate
federal prosecutor of the termination of an
investigation within 30 days of such termination.
Information on investigations which have been closed
shall be available on request to a United States
Attorney or his designee or an appropriate Department
of Justice official.

(5)  When a serious matter investigated by the FBI
is referred to state or local authorities for
prosecution, the FBI, insofar as resources permit,
shall promptly advise the federal prosecutor in writing
if the state or local authorities decline prosecution
or fail to commence prosecutive action within 120 days.
Where an FBI field office cannot provide this follow-
up, the SAC shall so advise the federal prosecutor.

(6)  When credible information is received
concerning serious criminal activity not within the FBI
investigative jurisdiction, the FBI field office shall
promptly transmit the information or refer the
complainant to the law enforcement agencies having
jurisdiction, except where disclosure would jeopardize
an ongoing investigation, endanger the safety of an
individual, disclose the identity of an informant,
interfere with an informant's cooperation, or reveal
legally privileged information.  If full disclosure is
not made for the reasons indicated, then whenever
feasible the FBI field office shall make at least
limited disclosure to the law enforcement agency having
jurisdiction, and full disclosure shall be made as soon
as the need for restricting dissemination is no longer
present.  Where full disclosure is not made to the
appropriate law enforcement agencies within 180 days,
the FBI field office shall promptly notify FBI
Headquarters in writing of the facts and circumstances
concerning the criminal activity.  The FBI shall make a
periodic report to the Deputy Attorney General on such
nondisclosure and incomplete disclosures, in a form
suitable to protect the identity of informants and
confidential sources.

Whenever information is received concerning
unauthorized criminal activity by an informant or
confidential source, it shall be handled in accord with
paragraph G of the Attorney General's Guidelines on Use
of Informants and Confidential Sources.

(7)  All requirements regarding investigations
shall apply to reopened investigations.  In sensitive
criminal matters, the United States Attorney or the
appropriate Department of Justice official shall be
notified in writing as soon as practicable after the
reopening of an investigation.

- 9 -

III.    Criminal Intelligence Investigations

This section authorizes the FBI to conduct criminal intelligence investigations of certain enterprises who seek either to obtain monetary or commercial gains or profits through racketeering activities or to further political or social goals through activities that involve criminal violence. These investigations differ from general crimes investigations, authorized by Section II, in several important respects. As a general rule, an investigation of a completed criminal act is normally confined to determining who committed that act and with securing evidence to establish the elements of the particular offense. It is, in this respect, self-defining. An intelligence investigation of an ongoing criminal enterprise must determine the size and composition of the group involved, its geographic dimensions, its past acts and intended criminal goals, and its capacity for harm. While a standard criminal investigation terminates with the decision to prosecute or not to prosecute, the investigation of a criminal enterprise does not necessarily end, even though one or more of the participants may have been prosecuted.

In addition, the organization provides a life and continuity of operation that are not normally found in a regular criminal activity. As a consequence, these investigations may continue for several years. Furthermore, as Justice Powell noted, the focus of such investigations "may be less precise than that directed against more conventional types of crime." United States v. United States District Court, 407 U.S. 297, 322 (1972). Unlike the usual criminal case, there may be no completed offense to provide a framework for the investigation. It often requires the fitting together of bits and pieces of information many meaningless by themselves to determine whether a pattern of criminal activity exists. For this reason, the investigation is broader and less discriminate than usual, involving "the interrelation of various sources and types of information." Id.

Members of groups or organizations acting in concert to violate the law present a grave threat to society. An investigation of organizational activity, however, may present special problems particularly where it deals with politically motivated acts. "There is often a convergence of First and Fourth Amendment values," in such matters that is "not found in cases of 'ordinary' crime." Id. Thus special care must be exercised in sorting out protected activities from those which may lead to violence or serious disruption of society. As a consequence, the guidelines establish safeguards for group investigations of special sensitivity, including tighter management controls and higher levels of review.

A.    Racketeering Enterprise Investigations

This section focuses on investigations of organized crime. It is concerned with investigation of

- 10 -

entire enterprises, rather than individual participants
in specific criminal acts, and authorizes
investigations to determine the structure and scope of
the enterprise as well as the relationship of the
members.  Except as specified below, this authority may
be exercised only when the activity engaged in by the
racketeering enterprise involves violence, extortion,
narcotics, or systematic public corruption.

1.   <u>Definitions</u>

Racketeering activity is any offense,
including the violation of state law,
encompassed by the Racketeer Influenced and
Corrupt Organizations Act, 18 U.S.C. Section
1961(1).

2.   <u>General Authority</u>

a.   The FBI has authority to conduct
investigations of racketeering
enterprises whose activities involve
violence, extortion, narcotics, or
systematic public corruption.  A
racketeering enterprise not engaged in
such activities may be investigated
under this authority only upon a written
determination by the Director, concurred
in by the Attorney General, that such
investigation is justified by
exceptional circumstances.

b.   A racketeering enterprise investigation
may be initiated when facts or
circumstances reasonably indicate that
two or more persons are engaged in a
continuing course of conduct for the
purpose of obtaining monetary or
commercial gains or profits wholly or in
part through racketeering activity.  The
standard of "reasonable indication" is
identical to that governing the
initiation of a general crimes
investigation under Part II.

c.   Authority to conduct racketeering
enterprise investigations is separate
from and in addition to general crimes
investigative authority under Part II
and domestic security/terrorism
investigations under Part III.
Information warranting initiation of a
racketeering enterprise investigation
may be obtained during the course of a

- 11 -

general crimes inquiry or investigation.
Conversely, a racketeering enterprise
investigation may yield information
warranting a general crimes inquiry or
investigation or a domestic
security/terrorism investigation.

3.    Purpose

The immediate purpose of a racketeering
enterprise investigation is to obtain
information concerning the nature and
structure of the enterprise, as specifically
delineated in paragraph II D below, with a
view to the longer range objective of
detention, prevention, and prosecution of the
criminal activities of the enterprise.

4.    Scope

a.    A racketeering enterprise investigation
properly initiated under these
guidelines may collect such information
as:

(i)    The members of the enterprise and
other persons likely to be
knowingly acting in the
furtherance of racketeering
activity, provided that the
information concerns such persons'
activities on behalf of or in
furtherance of the enterprise;

(ii)    the finances of the enterprise;

(iii)   the geographical dimensions of the
enterprise; and

(iv)    the past and future activities and
goals of the enterprise.

b.    In obtaining the foregoing information,
any lawful investigative technique may
be used, in accordance with the
requirements of Part IV.

5.    Authorization and Renewal

a.    A racketeering enterprise investigation
may be authorized by the Director or
designated Assistant Director upon a
written recommendation setting forth the
facts and circumstances reasonably

- 12 -

indicating the existence of a
racketeering enterprise whose activities
involve violence, extortion, narcotics,
or systematic public corruption.  In
such cases the FBI shall notify the
Attorney General or his designee of the
opening of the investigation.  An
investigation of a racketeering
enterprise not involved in these
activities may be authorized only by the
Director upon his written determination,
concurred in by the Attorney General,
that such investigation is warranted by
exceptional circumstances.  In all
investigations, the Attorney General
may, as he deems necessary, request the
FBI to provide a report on the status of
the investigation.

b.   A racketeering enterprise investigation
may be initially authorized for a period
of up to 180 days.  An investigation may
be continued upon renewed authorization
for additional periods each not to
exceed 180 days.  Renewal authorization
shall be obtained from the Director or
designated Assistant Director.  The
concurrence of the Attorney General must
also be obtained if his concurrence was
initially required to authorize the
investigation.

c.   Investigations shall be reviewed by the
Director or designated senior
Headquarters official on or before the
expiration of the period for which the
investigation and each renewal thereof
is authorized.

d.   An investigation which has been
terminated may be reopened upon a
showing of the same standard and
pursuant to the same procedures as
required for initiation of an
investigation.

B.   <u>Domestic Security/Terrorism Investigations</u>

This section focuses on investigations of
enterprises, other than those involved in international
terrorism, whose goals are to achieve political or
social change through activities that involve force or
violence.  Like racketeering enterprise investigations,
it is concerned with the investigation of entire

- 13 -

enterprises, rather than individual participants and specific criminal acts, and authorizes investigations to determine the structure and scope of the enterprise as well as the relationship of the members.

1. <u>General Authority</u>

   a. A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States. The standard of "reasonable indication" is identical to that governing the initiation of a general crimes investigation under Part II. In determining whether an investigation should be conducted, the FBI shall consider all of the circumstances including: (1) the magnitude of the threatened harm; (2) the likelihood it will occur; (3) the immediacy of the threat; and (4) the danger to privacy and free expression posed by an investigation.

   b. Authority to conduct domestic security/terrorism investigations is separate from and in addition to general crimes investigative authority under Part II, racketeering enterprise investigations under Part III A and international terrorism investigations under the Attorney General's Guidelines for Foreign Intelligence Collection and Foreign Counterintelligence Investigations. Information warranting initiation of an investigation under this section may be obtained through the course of a general crimes inquiry or investigation, a racketeering enterprise investigation, or an investigation of international terrorism. Conversely, a domestic security/terrorism investigation may yield information warranting a general crimes inquiry or investigation, a racketeering enterprise investigation, or an investigation of international terrorism.

- 14 -

    c.   In the absence of any information indicating planned violence by a group or enterprise, mere speculation that force or violence might occur during the course of an otherwise peaceable demonstration is not sufficient grounds for _initiation_ of an investigation under this section.  For alternative authorities see Part II relating to General Crimes Investigations and the Attorney General's Guidelines on "Reporting on Civil Disorders and Demonstrations Involving a Federal Interest."  This does not preclude the collection of information about public demonstrations by enterprises that are under active investigation pursuant to paragraph B 1(a) above.

2.   **Purpose**

The immediate purpose of a domestic security/terrorism investigation is to obtain information concerning the nature and structure of the enterprise as specifically delineated in paragraph (3) below, with a view to the longer range objectives of detection, prevention, and prosecution of the criminal activities of the enterprise.

3.   **Scope**

    a.   A domestic security/terrorism investigation initiated under these guidelines may collect such information as:

        (i)   the members of the enterprise and other persons likely to be knowingly acting in furtherance of its criminal objectives, provided that the information concerns such persons' activities on behalf or in furtherance of the enterprise;

        (ii)   the finances of the enterprise;

        (iii)   the geographical dimensions of the enterprise; and

        (iv)   past and future activities and goals of the enterprise.

- 15 -

b.    In obtaining the foregoing information,
any lawful investigative technique may
be used in accordance with requirements
of Part IV.

4.    Authorization and Renewal

a.    A domestic security/terrorism
investigation may be authorized by the
Director or designated Assistant
Director upon a written recommendation
setting forth the facts or circumstances
reasonably indicating the existence of
an enterprise as described in this
subsection.  In such cases, the FBI
shall notify the Office of Intelligence
Policy and Review of the opening of the
investigation.  In all investigations
the Attorney General may, as he deems
necessary, request the FBI to provide a
report on the status of the
investigation.

b.    A domestic security/terrorism
investigation may be initially
authorized for a period of up to 180
days.  An investigation may be continued
upon renewed authorization for
additional periods each not to exceed
180 days.  Renewal authorization shall
be obtained from the Director or
designated Assistant Director.

c.    Investigations shall be reviewed by the
Director or designated Senior Head-
quarters official on or before the
expiration period for which the investi-
gation and each renewal thereof is
authorized.

d.    Each investigation should be reviewed at
least annually to insure that the
threshold standard is satisfied and that
continued allocation of investigative
resources is warranted.  In some cases,
the enterprise may meet the threshold
standard but be temporarily inactive in
the sense that it has not engaged in
recent acts of violence, nor is there
any immediate threat of harm — yet the
composition, goals and prior history of
the group suggests the need for
continuing federal interest.  Under
those circumstances, the investigation

- 16 -

may be continued but reasonable efforts should be made to limit the coverage to information which might indicate a change in the status or criminal objectives of the enterprise.

e. An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation.

f. The FBI shall report the progress of a domestic security/terrorism investigation to the Office of Intelligence Policy and Review not later than 180 days after the initiation thereof, and the results at the end of each year the investigation continues. The Office of Intelligence Policy and Review shall review the results of each investigation at least annually.

IV. Investigative Techniques

A. When conducting investigations under these guidelines, the FBI may use any lawful investigative technique. Before employing a technique, the FBI should consider whether the information could be obtained in a timely and effective way by less intrusive means. Some of the factors to be considered in judging intrusiveness are adverse consequences to an individual's privacy interests and avoidable damage to his reputation. Whether a highly intrusive technique should be used depends on the seriousness of the crime and the strength of the information indicating the existence of the crime. It is recognized that choice of technique is a matter of judgment.

B. All requirements for use of a technique set by statute, Department regulations and policies, and Attorney General Guidelines must be complied with. The investigative techniques listed below are subject to the noted restrictions:

1. Informants and confidential sources must be used in compliance with the Attorney General's Guidelines on the Use of Informants and Confidential Sources;

2. Undercover operations must be conducted in compliance with the Attorney General's Guidelines on FBI Undercover Operations;

3. Undisclosed participation in the activities of an organization by an undercover employee or cooperating private individual in a manner that may influence the exercise of rights protected by the First Amendment must be approved by FBIHQ, with notification to Department of Justice;

4. Nonconsensual electronic surveillance must be conducted pursuant to the warrant procedures and requirements of Title 18 U.S.C. 2510-2521;

5. Pen registers and trap and trace devices must be installed and used pursuant to the procedures and requirements of Title 18 U.S.C. 3121-3127;

6. Access to stored wire and electronic communications and transactional records must be obtained pursuant to the procedures and requirements of Title 18 U.S.C. 2701-2710;

7. Consensual electronic monitoring must be authorized pursuant to Department policy. For consensual monitoring of conversations other than telephone conversations, advance authorization must be obtained in accordance with established guidelines. This applies both to devices carried by the cooperating participant and to devices installed on premises under the control of the participant. See USAM 9-7.013. For consensual monitoring of telephone conversations, advance authorization must be obtained from the SAC and the appropriate U. S. Attorney, except in exigent circumstances;

8. Searches and seizures must be conducted under the authority of a valid warrant unless the search or seizure comes within a judicially recognized exception to the warrant requirement. See also, Attorney General's Guidelines on Methods of Obtaining Documentary Materials Held by Third Parties;

9. Whenever an individual is known to be represented by counsel in a particular matter, the FBI shall follow applicable law

- 18 -

and Department procedure concerning contact with represented individuals in the absence of prior notice to their counsel. The SAC or his designee and the United States Attorney shall consult periodically on applicable law and Department procedure.

V.    Dissemination of Information

The FBI may disseminate information during investigations conducted pursuant to these guidelines to another Federal agency or to a State or local criminal justice agency when such information:

A.   falls within the investigative or protective jurisdiction or litigative responsibility of the agency;

B.   may assist in preventing a crime or the use of violence or any other conduct dangerous to human life;

C.   is required to be furnished to another Federal agency by Executive Order 10450, as amended, dated April 27, 1953, or a successor Order;

D.   is required to be disseminated by statute, interagency agreement approved by the Attorney General, or Presidential Directive;

and to other persons and agencies as permitted by Sections 552 and 552a of Title V, U.S.C.

VI.   Cooperation with Secret Service

The FBI is authorized to provide investigative assistance in support of the protective responsibilities of the Secret Service, provided that all preliminary inquiries or investigations are conducted in accordance with the provisions of these guidelines.

VII.  Reservation

A.   Nothing in these guidelines shall limit the general reviews or audits of papers, files, contracts, or other records in the government's possession, or the performance of similar services at the specific request of a Department or agency of the United States. Such reviews, audits or similar services must be for the purpose of detecting or preventing violations of federal law which are within the investigative responsibility of the FBI.

- 19 -

B.   Nothing in these guidelines is intended to limit
     the FBI's responsibilities to investigate certain
     applicants and employees under the federal
     personnel security program.

C.   These guidelines are set forth solely for the
     purpose of internal Department of Justice
     guidance.  They are not intended to, do not, and
     may not be relied upon to create any rights,
     substantive or procedural, enforceable at law by
     any party in any manner, civil or criminal, nor do
     they place any limitation on otherwise lawful
     investigative and litigative prerogatives of the
     Department of Justice.

                                    Dick Thornburgh
                                    Attorney General

Date:   March 21, 1989

# Memorandum



To      :   SAC, PITTSBURGH (100A-PG-61348)(P)      Date   5/30/95

From    :   SA J.C. RAFFETY

Subject :   THE MOUNTAINEER MILITIA
            DS/T
            (OO: PITTSBURGH)

| IIS-PITTSBURGH |  |
|---|---|
| ENTER | |
| DELETE | |
| MODIFY | |
| REVIEW | |
| THRU SERIAL | |

Re FBIHQ tel, 4/24/95, captioned, "OKBOMB; MAJOR CASE 117; (OO: PITTSBURGH)," and telcal of SA J.C. RAFFETY, Clarksburg RA, to SSRA WELLS L. MORRISON, III, MVRA, 5/22/95.

This memorandum is submitted in furtherance of a request to initiate a preliminary inquiry into the activities of captioned organization for an initial period not to exceed 90 days.

By way of background, The Mountaineer Militia (TMM) was established in December 1994 by FLOYD RAYMOND LOOKER, JR., 210 Maple Avenue, Stonewood, Harrison County, WV, W/M, D/POB 8/18/40, Mt. Vernon, Ohio, SSAN 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.

LOOKER, who holds the rank of Adjutant General in TMM, was interviewed by Bureau Agents per FBIHQ instructions on 4/28/95, at Clarksburg, WV.

LOOKER advised TMM has active chapters in 37 of the 55 counties located in West Virginia. LOOKER refused to discuss membership as to number or specific locations.

LOOKER advised TMM engages in para military training, to include firearms; however, he advised automatic weapons are prohibited. LOOKER also advised that construction of booby-traps and/or explosive devices is taught but no actual explosives are utilized in the training exercises.

LOOKER advised TMM was created to provide a means of citizen defense in protection of constitutional rights perceived as under threat from the United States Government.

1 - SSRA MORRISON
JCR/dm

# ATTACHMENT THREE

100A-PG-

LOOKER identified those "enemies" of the Constitution as the Bureau of Alcohol, Tobacco and Firearms (BATF); President BILL CLINTON; Attorney General JANET RENO; the United States Department of Justice and Multi-jurisdictional task forces.

LOOKER commented any "BATF Agent coming through my door to take my gun will not make it."

LOOKER also advised TMM maintains contact with other militia organizations in Texas, Ohio, Pennsylvania and Florida.

On 5/5/95, and 5/17/95, writer interviewed a cooperative witness (CW) who has maintained a close association with LOOKER for a period of approximately five years and is familiar with TMM activities and organization.

CW advised LOOKER was approached in about September 1994, by an individual identified as DAMON BLACK, a marketing executive employed by A.R.G. Marketing, Inc., a North Carolina firm. BLACK, a resident of Colorado, attended several meetings in the Clarksburg, WV, area. BLACK, who reportedly has some connection with militia organizations in Arizona, Colorado and Montana discussed militia infrastructure, security, operations and methodology for raising funds to cover operational expenses.

BLACK discussed the need to establish a number of weapons caches throughout the region in the event TMM is activated. BLACK is a strong advocate of maintaining a large supply of ammunition and weapons.

LOOKER, in attendance at these meetings, assumed command of TMM with the title Adjutant General, and began recruitment efforts and established liaison with other militia groups.

CW was approached by LOOKER in the Spring, 1995, to provide training of topics related to the construction of explosive devices from common household products and the assembly of timing devices utilized in detonation such explosives. LOOKER also asked CW to obtain C-4 military type explosive charges. CW refused, citing concern of illegal activity and fear of arrest as a result of unauthorized action by TMM members so trained.

LOOKER told CW that such training was necessary should the militia declare war on the United States Government as a result of continued Government violation of the United States

2

100A-PG-

Constitution. CW was also asked to identify specific types of
explosive devices which could be used against a particular
target, i.e., dams, communications towers, bridges, etc. CW
advised refused, telling LOOKER he/she was concerned about
breaking the law. Though upset with CW's refusal, LOOKER
maintained his friendship with CW.

LOOKER has also advised CW that DAMON BLACK reportedly
has said it is imperative the various militia organizations work
independently but must also operate in concert. BLACK has also
advised LOOKER the only way to get strength is through explosives
and weapons.

LOOKER has recently advised that weapons have, in fact,
been secreted throughout the area, and explosives are also stored
at several locations in southern West Virginia. LOOKER declined
to comment when CW asked if weapons included the automatic type.

CW recently visited a 600 acre farm in rural Lewis
County, WV, which is owned by a TMM member. TMM is currently
constructing a sniper-training range at that location with target
distances of 100 to 800 yards.

CW estimated based on inferences/statements of LOOKER,
TMM consists of 500-600 members. LOOKER recently advised a loss
of between 20% to 30% membership has occurred as a result of
negative publicity regarding the Oklahoma bombing. LOOKER
advised that is offset by "dedication to the cause" of the
remaining members and recent recruits.

Per review of Attorney General Guidelines regarding
Domestic Security/Terrorism investigations and conversations
among ASAC, SSA KLUMB, writer and SSRA MORRISON, it is requested
that a new 100A matter preliminary inquiry be opened and assigned
to writer.

3*