U.S. DISTRICT COURT
FILED AT WHEELING, WV
AUG 1 3 1997
NORTHERN DISTRICT OF WV
OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

    v.                      CRIMINAL NO. 1:96CR43

FLOYD RAYMOND LOOKER, a/k/a RAY, and
JAMES R. ROGERS, a/k/a RICH.

      Defendants.

## MEMORANDUM REGARDING THE
## TESTIMONY OF SPECIAL AGENT EARL ROBERTS

The Government will call Special Agent Earl Roberts, an engineer, as an expert witness.

Roberts graduated with a bachelors of science degree in mechanical engineering from Cornell

University in 1970. He also attended a concentrated course in construction contracts in 1985.

Roberts was the Chief Engineer of the Criminal Justice Information Services Division from 1992

to 1996. He was responsible for the design and construction of the Clarksburg facility.

Additional responsibilities included operation maintenance and security at the facility.

Currently, Roberts is the Chief of Construction and Facilities Management Section, FBI

Academy. He is responsible for planning design and construction at the FBI Academy as well as

facilities management and security.

Before being the Chief Engineer for the Criminal Justice Information Service Division,

Roberts was the Chief of Facilities Management Unit for the Administrative Service Division

from 1987 to 1992. He was responsible for the operation and maintenance of FBI Headquarters,

1

space management of FBI space throughout the U.S. and the planning, design and construction of projects at FBI Headquarters and in FBI field offices. Before to that he was the Contracting Officer Technical Representative and Contacting Officer for various construction contracts for expansion and renovation of FBI field offices throughout the United States from 1984 to 1987. He has also previously testified as an expert witness in the U.S. District Court in Helena, Montana as to construction bid rigging in 1984.

He will testify to the vitality of the specific blueprints photographed and this will be used to show the defendant's motives for committing the crimes alleged. In summary, he will testify that the blueprints chosen by defendant Rogers, which were photographed and supplied to defendant Looker, were the blueprints among the hundreds of blueprints of the entire facility, which would be important and necessary to doing damage to or destroying the Criminal Justice Information Services Division complex. His testimony at issue here is admissible because it is helpful to show the jury the defendants' intent and motive to injure or destroy this facility, although that ultimate conclusion will be left to the trial jury. See statement of Earl Roberts, attached hereto as Exhibit A.

The defendant Rogers believes that the Court should use a Daubert analysis in determining the admissibility of Special Agent Roberts' testimony as an expert witness. However, the more proper analysis is under Federal Rule of Evidence 702 (Testimony by Experts).

Federal Rule of Evidence 702 provides "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The Rule "is broadly interpreted, and

2

helpfulness to the trier of fact is its 'touchstone.'" Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). The Advisory Committee Notes to Rule 702 state that

> "[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vad.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore §1918.

Special Agent Roberts will be using his technical and/or specialized knowledge of the blueprints to assist the jury in determining the motives of the defendants.

Under Daubert v. Merrel Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that a trial judge faced with a proffer of expert scientific testimony must determine at the outset, pursuant to Federal Rule of Evidence 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. The Court of Appeals for the Fourth Circuit has followed the Daubert analysis in criminal and civil cases. U.S. v. Dorsey, 45 F.3d 809 (4th Cir. 1995); U.S. v. Powers, 59 F.3d 1460 (4th Cir. 1995); U.S. v. Bynum, 3 F.3d 769 (4th Cir. 1993).

However, the Daubert analysis is confined to the evaluation of 'scientific' expert testimony. Thorton v. Caterpillar, 951 F.Supp. 575 (D.S.C. 1997). The Supreme Court in Daubert explained that "Rule 702 also applies to 'technical, or other specialized knowledge.' Our discussion is limited to the scientific context because that is the nature of the expertise offered here." Daubert at 590, n. 8. The Supreme Court did hold that "the Federal Rules of Evidence-- especially 702--do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task as hand." Daubert at 598.

In Thorton, Judge Anderson held that "Daubert is not applicable, nor was it intended to

3

apply, to experts testifying in the field of technical or other specialized knowledge. Engineers can be classified as possessing either technical or other specialized knowledge but by definition they can never be legitimately classified as scientists." Thorton at 577. Additionally, the Court held that "Daubert has no other application for use in the expert field of engineering, as well as the fields of general medical issues, real estate or other types of technical subjects or those requiring specialized knowledge." Thorton at 577. The Court cited Iacobelli Const., Inc. v. County of Monroe, 32 F.3d 19 (2d Cir. 1994) in support for it conclusion. In Iacobelli Const., the Court of Appeals for the Second Circuit held that the district court erred in applying Daubert to an expert on construction site conditions, contract document and project results because such testimony is not scientific.

The Fourth Circuit has held that "testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf at 377. Special Agent Roberts' knowledge, skill, experience, training, and education should qualify him as an expert witness as to the blueprints of the Criminal Justice Information Services facility of the Federal Bureau of Investigation and to the importance of the specific blueprints photographed and provided.

Respectfully submitted,

William D. Wilmoth
United States Attorney

4

## CERTIFICATE OF SERVICE

I, William D. Wilmoth, United States Attorney for the Northern District of West Virginia, do hereby certify that a copy of the foregoing MEMORANDUM REGARDING THE TESTIMONY OF SPECIAL AGENT EARL ROBERTS was hand-delivered to William Cipriani and William Gallagher and was mailed to Gary Zimmerman this Mr. Gary B. Zimmerman, Esq., at Suite 304, 100 Ross Street, Pittsburgh, PA 15219, this 13th day of August, 1997.

William D. Wilmoth
United States Attorney

EXHIBIT A

FD-302 (Rev. 3-10-82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription          4/30/96

On February 22, 1996, Supervisory Special Agent (SSA) EARL G. ROBERTS, Chief Engineer, Criminal Justice Information Services (CJIS) Division, met with Special Agents (SAs) J.C. RAFFETY and LESLIE D. HOPPEY of the Clarksburg Resident Agency and Supervisory Senior Resident Agent WELLS L. MORRISON, III, Pittsburgh Division.  Also present during the meeting was SSA DAVID R. LOESCH, Section Chief, Resources Management Section, CJIS.

The purpose of the meeting was to review and discuss photographs that SAs RAFFETY and HOPPEY obtained of what appeared to be various construction blueprints.  SA RAFFETY provided SSA ROBERTS with a 9" X 12" plain manila envelope which contained 1 - 8 1/2" x 11" and 1 - 11" X 17" and 35 4" X 6" photographs of various construction blueprints.  A preliminary review of these photographs indicated that all of the photographs were of construction blueprints for the Federal Bureau of Investigation's CJIS Facility in Clarksburg, West Virginia.  These blueprints showed the overall plan of the West Virginia site (i.e., the location of the various buildings, roadways and parking lots), as well as specific details concerning buried underground utilities and a general view of the inside of Building 3, the Computer Center.  It was also noted that some of the 4" X 6" photographs appeared to be sections of blueprints that, when pieced together with several other photographs, would yield a complete construction drawing.

A detailed review of these photographs and comparison of these with the CJIS Facility's construction drawings reflect the following:

|        4" X 6" Photo #        |        Relation to construction drawings        |
|-------------------------------|-------------------------------------------------|
| 1.                            | Lower left corner of drawing C-1 providing definitions or meaning of various drawing symbols. |

Investigation on    2/22/96        at    Clarksburg, WV

File #    266A-PG-62251

by    SSA Earl G. Roberts/dml                    Date dictated    4/16/96

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 11-15-83)

266A-PG-62251

Continuation of FD-302 of    Review of photographs _____ . On   2/22/96  . Page   2

          2.                  Upper left corner of drawing
C-1 providing definitions or
meaning of various drawing
symbols.

          3.                  Upper right corner of drawing
C-1 providing a vicinity map
showing the location of the
CJIS site relative to major
roadways and cities.

          4.                  Lower right corner drawing C-1
Title block of drawing C-1.

          5.                  Lower right corner of drawing
C-2 providing definitions of
abbreviations used on the
drawings.

          6.                  Drawing C-3 providing an
overall site description
showing locations of roads,
buildings and major utility
lines.

          7.                  Upper left corner of drawing
C-3A showing critical activity
location on the west and
central portions of the site.
A critical activity is one
which has a direct effect on
the project schedule and is
therefore designated as a
milestone of project activity.

          8.                  Lower right corner of drawing
C-3A showing critical activity
location on the eastern
portion of the site.

          9.                  Lower corner of drawing C-3A
showing critical activity
location on southern (Barnets
Run) portion of the site.

        10.                  Drawing C-4 showing an overall
site map which has been

FD-302a (Rev. 11-15-83)

266A-PG-62251

Continuation of FD-302 of ___Review of photographs_____ . On ___2/22/96___ , Page ___3___

                                          divided into individual work areas.

11. Lower right corner of drawing C-58 entitled, "Underground Utility Area 1," showing location of underground utilities west of West Security Station.

12. Upper left corner of drawing C-58 showing underground utilities at the West Site boundary.

13. Center portion of drawing C-58 showing underground utilities around the West Security Station.

14. Portion of the right side of Drawing C-58 showing underground utilities east of the West Security Station.

15. Lower right corner of drawing C-65 entitled, "Underground Utilities Area 8," showing underground utilities south and east of the Central Plant.

16. Central portion of drawing C-65 showing the Central Plant and its relation to the surrounding underground utilities.

17. Upper left corner of drawing C-65 showing underground utilities north and west of the Central Plant.

18. Lower left corner drawing C-65 showing underground utilities west and south of the Central Plant.

FD-302a (Rev. 11-15-83)

266A-PG-62251

Continuation of FD-302 of  Review of photographs _____ . On  2/22/96 . Page  4

19.                              Lower right corner of drawing
                                 C-113, entitled, "Electrical
                                 Sections and Details."

20.                              Upper left corner of drawing
                                 C-83 showing underground
                                 utilities at the property line
                                 at Barnets Run.

21.                              Upper right corner of drawing
                                 C-83 showing underground
                                 utilities north of the
                                 property line at Barnets Run.

22.                              Lower right corner of drawing
                                 C-83 entitled, "Utility Trunk
                                 Line Area 30."

23.                              Lower corner of drawing S3-2-
                                 2, entitled, "Building Number
                                 3, Building Elevation."

24.                              Lower left corner of drawing
                                 C-113 (photo #19) showing
                                 typical sections of power and
                                 communications underground
                                 lines.

25.                              Upper right corner of drawing
                                 C-113 showing typical sections
                                 of power and communications
                                 underground lines.

26.                              Upper left corner of drawing
                                 C-113 showing typical sections
                                 of power and communications
                                 underground lines.

27.                              Detail 2 of drawing S3-2-7
                                 showing a sectional view of
                                 stairwell #4 into Building 3
                                 indicating how the stairwell
                                 is constructed.

28.                              Detail 1 of drawing S3-2-7
                                 showing an elevation of
                                 stairwell #4 into Building 3

FD-302a (Rev. 11-15-83)

266A-PG-62251

Continuation of FD-302 of _Review of photographs_____ . On __2/22/96__ . Page __5__

indicating how the stairwell is constructed.

29.          Upper portion of drawing S3-2-2 (photo #23) showing an elevation of Building 3 depicting basic structure and locations of mechanical and electrical penetrations.

30.          Lower portion of drawing S3-2-2 showing an elevation of Building 3 depicting basic structure and locations of mechanical and electrical penetrations.

31.          Lower right corner of bid package #2 drawing M3-2-5 showing typical manhole detail for underground chilled water storage tank.

32.          Upper center portion of drawing M3-2-5 showing a longitudinal detail of the installation of the underground chilled water storage tank.

33.          Upper right corner of drawing M3-2-5 showing an elevation of the end of the underground chilled water storage tank.

34.          Lower right corner of drawing M3-2-5 entitled, "Building #3 Chilled Water Storage Details."

35.          Lower left corner of drawing M3-2-5 showing piping installation details and baffling for the underground chilled water storage tank.

FD-302a (Rev. 11-15-83)

266A-PG-62251

Continuation of FD-302 of  <u>Review of photographs</u>                          , On  <u>2/22/96</u> , Page  <u>6</u>

        The 8 1/2" X 11" and 11" X 17" photographs provided are
both of drawing C-3 which provides an overall view of the site
showing the locations of buildings, roadways and major utility
lines.

        All of the photographs provided show specific
information concerning the CJIS Facility.  The photographs
supplied describe 12 of the over 1,650 construction drawings
printed for this project.  They were taken from at least two
different bid packages and involve civil, structural and
mechanical drawings.  Within a given bid package, drawings are
grouped or separated by discipline (e.g. structural).  The number
of CJIS construction drawings, the grouping of drawings by bid
package and within bid packages by discipline, all indicate that
the construction drawings photographed were carefully selected to
convey specific information.  The drawings photographed provide
the general location and layout of the CJIS Facility, specific
details concerning the location and construction of various
underground utilities and specific details concerning the
construction of the underground Computer Center.

        Some of the photographs provided appear to be taken to
add definition or explanation to other photographs.  For example,
photograph #10 provides a map of the site showing the grid that
the site has been divided into for the installation underground
utilities.  Photograph #s 11, 12, 13, 14, 15, 16, 17, 18, 20, 21,
and 22 provide specific underground utilities information for
three of the areas delineated by the work area grid shown on
photograph #10.  Photograph #s 19, 24, 25 and 26 provide specific
construction details for the power and communications utilities
shown in these three areas.